UNITED STATES of America,
Plaintiff-Appellee,

v.

Walter "Frenchy" BAGNELL,
Defendant-Appellant.

No. 81–5384.

United States Court of Appeals,
Eleventh Circuit.

June 28, 1982.

Roger Jon Diamond, Pacific Palisades, Cal., for defendant-appellant.

William C. Bryson, Patty Merkamp Stemler, Washington, D. C., for plaintiff-appellee.

Before VANCE, HATCHETT and ANDERSON, Circuit Judges.

VANCE, Circuit Judge:

Appellant, Walter Bagnell, challenges his conviction under the federal obscenity statutes. After trial by jury, Bagnell was convicted under two counts charging use of a common carrier for the interstate transportation of obscene material, in violation of 18 U.S.C. § 1462,[1] and two counts charging interstate transportation of obscene material for purposes of sale and distribution, in violation of 18 U.S.C. § 1465.[2] On appeal, Bagnell asserts numerous errors, none of which is meritorious. We therefore affirm.[3]

In early 1977 the Federal Bureau of Investigation (FBI) began a nationwide investigation into violations of the federal obscenity laws, focusing upon shipments of obscene materials to the Miami, Florida area. As part of the investigation, FBI Agent Patrick J. Livingston formed a corporation, Gold Coast Specialties, from which he purported to operate a mail order pornography business. Livingston traveled throughout the country to arrange for shipments of pornographic materials to the Miami based Gold Coast Specialties from various producers and distributors. On September 7, 1977 Livingston was introduced to Bagnell in Los Angeles, California by Paul Howard, an owner of several adult book stores and massage parlors in Tampa, Florida who had previously purchased pornography from Bagnell. During this meeting, Livingston and Bagnell discussed the pornography industry, their connections with it across the country, and the attendant difficulties with law enforcement efforts and debt collection. Specifically, Bagnell mentioned his efforts to avoid detection for shipping pornography to Tulsa, Oklahoma and his problems with a customer in Baltimore, Maryland who owed him $34,000.

Bagnell and Livingston met again the next day. At that time Livingston proposed to purchase some of Bagnell's movies, and Bagnell readily agreed to the sale of fifty movies. The only thing about which there was any debate was the price, which they quickly set at $5.50 for each film. Livingston received the films in Miami four

---

1. 18 U.S.C. § 1462 provides in pertinent part:

Whoever brings into the United States, or any place subject to the jurisdiction thereof, or knowingly uses any express company or other common carrier, for carriage in interstate or foreign commerce—
(a) any obscene, lewd, lascivious, or filthy book, pamphlet, picture, motion-picture film, paper, letter, writing, print, or other matter of indecent character; or

. . . . .

Whoever knowingly takes from such express company or other common carrier any matter or thing the carriage of which is herein made unlawful—
Shall be fined not more than $5,000 or imprisoned not more than five years, or both, for the first such offense and shall be fined not more than $10,000 or imprisoned not more than ten years, or both, for each such offense thereafter.

2. 18 U.S.C. § 1465 provides in pertinent part:

Whoever knowingly transports in interstate or foreign commerce for the purpose of sale or distribution any obscene, lewd, lascivious, or filthy book, pamphlet, picture, film, paper, letter, writing, print, silhouette, drawing, figure, image, cast, phonograph recording, electrical transcription or other article capable of producing sound or any other matter of indecent or immoral character, shall be fined not more than $5,000 or imprisoned not more than five years, or both.

3. Bagnell was fined $5,000 and sentenced to prison for eighteen months under the first count of the indictment. He was placed on probation for a total of five years on the remaining three counts, subject to the condition that he not distribute sexually explicit material to Florida during his probationary period.

days later,[4] and paid Bagnell by check when the two met at Paul Howard's home in Tampa on September 15, 1977.

Bagnell and Livingston met once more, on October 11 in Chicago, Illinois. Livingston's check for the fifty movies had bounced, so Livingston repaid Bagnell in cash. At the same time Livingston arranged to purchase more movies from Bagnell for $5.00 each. On December 14, 1977 Livingston received in Miami a shipment of four movies from Bagnell. Unlike the first shipment, which consisted of several heterosexual movies, this second shipment contained two copies each of two different films portraying homosexual acts.[5]

Bagnell had no further contacts with Livingston, but he was not charged with any crime for over a year. On February 11, 1980, however, a federal grand jury for the southern district of Florida indicted Bagnell and forty-four other persons for conspiracy to violate the federal obscenity statutes and numerous parallel substantive violations. This original indictment was eventually superseded and the grand jury issued sixteen separate indictments. One of these superseding indictments charged Bagnell individually with four offenses arising out of the two movie shipments to Miami. A jury subsequently convicted Bagnell and this appeal followed.

## I. VENUE

Bagnell first contends that venue did not properly lie in the southern district of Florida because the government's decision to prosecute him in that district constituted improper forum shopping. Specifically, he contends that the government chose to have him ship materials to the southern district of Florida because it believed that a jury applying the community standards of that district would probably find that the materials were obscene. He asserts that such forum shopping by the government violates

his right to due process. Assuming *arguendo* that Bagnell's characterization of the government's conduct as forum shopping is accurate, his argument evinces a misunderstanding of the principles of venue and due process and therefore must fail.

 The right of criminal defendants to be tried in the state and judicial district in which the alleged crime occurred is guaranteed by article III of and the sixth amendment to the United States Constitution as well as Rule 18 of the Federal Rules of Criminal Procedure. *United States v. Davis*, 666 F.2d 195, 198–99 (5th Cir. 1982). It is well established that the use of common carriers to ship obscene materials and the interstate shipment of such materials are continuing offenses that occur in every judicial district which the material touches. *See Reed Enterprises v. Clark*, 278 F.Supp. 372, 380 (D.D.C.1967) (three judge court), *aff'd mem.*, 390 U.S. 457, 88 S.Ct. 1196, 20 L.Ed.2d 28 (1968). Consequently, there is no constitutional impediment to the government's power to prosecute pornography dealers in any district into which the material is sent. *Id. Cf. Hamling v. United States*, 418 U.S. 87, 106, 94 S.Ct. 2887, 2901, 41 L.Ed.2d 590 (1974) ("distributors of allegedly obscene materials may be subjected to varying community standards in the various federal judicial districts into which they transmit the materials"). The venue question, then, becomes one of legislative intent. *Travis v. United States*, 364 U.S. 631, 636–37, 81 S.Ct. 358, 361–362, 5 L.Ed.2d 340 (1961). Specifically, did Congress intend to allow the prosecution of pornography distributors in the district to which they transmit their products? This question must be answered with a resounding yes.

 Section 1462 proscribes the use of common carriers to distribute obscene material, while section 1465 prohibits the

---

**4.** The September 12, 1977 shipment contained ten copies each of five different movies from the "Sexual World" series. Only two of the movies were the subject of the criminal charges eventually brought against Bagnell.

**5.** The titles of these two movies were *Jeff and Frank* and *Dale and Ed*, both from the "Intimate Moments" series. Both movies were introduced into evidence and formed the basis for two of the four counts of Bagnell's indictment.

transportation of such material through interstate commerce. By their very terms, these statutes describe offenses within the venue provisions of 18 U.S.C. § 3237(a), which declares that any offense "involving the use of the mails, or transportation in interstate commerce" is a continuing offense that may be prosecuted in any district in which the crime took place.[6] *United States v. Peraino*, 645 F.2d 548, 551 (6th Cir. 1981). Venue was therefore proper in the southern district of Florida because it is the district in which the materials were received. *See United States v. Walker*, 559 F.2d 365, 372 (5th Cir. 1977); *United States v. Slepicoff*, 524 F.2d 1244, 1249 (5th Cir. 1975), *cert. denied*, 425 U.S. 998, 96 S.Ct. 2215, 48 L.Ed.2d 824 (1976); *United States v. McManus*, 535 F.2d 460, 463–64 (8th Cir. 1976), *cert. denied*, 429 U.S. 1052, 97 S.Ct. 766, 50 L.Ed.2d 769 (1977).[7]

Bagnell argues that the Supreme Court's disposition of *Blucher v. United States*, 439 U.S. 1061, 99 S.Ct. 823, 59 L.Ed.2d 27 (1979), compels a contrary conclusion. He contends that *Blucher* stands for the proposition that the due process clause precludes forum shopping of any sort in obscenity cases, thus overriding general venue principles which would otherwise allow his trial to be held in the southern district of Florida. We disagree. In *Blucher* the defendant was convicted of obscenity charges after egregious forum shopping by the local

prosecutors. The tenth circuit affirmed the conviction, stating that venue in pornography cases was "subject to the creative zeal of federal enforcement officers." *United States v. Blucher*, 581 F.2d 244, 245–46 (10th Cir. 1978). While a petition for certiorari on the forum shopping point was pending before the Supreme Court, the Solicitor General moved to dismiss the indictment as contrary to an internal Justice Department policy regarding venue in obscenity prosecutions. The Supreme Court subsequently vacated the conviction without comment and ordered the indictment dismissed. *Blucher v. United States*, 439 U.S. at 1061, 99 S.Ct. at 823.

■ It is clear that the Supreme Court's disposition of *Blucher* was not a decision on the merits of the venue claim, but was merely a response to the Solicitor General's motion. *See Thompson v. United States*, 444 U.S. 248, 249–50, 100 S.Ct. 512, 513–514, 62 L.Ed.2d 457 (1980) (per curiam) (citing *Blucher* as an example where the Court has "responded to requests by the Government . . . by granting certiorari and vacating the judgments"). Consequently, the summary action of the Supreme Court in *Blucher* has no precedential value for the specific venue issue presented in this case. Indeed, Bagnell's due process argument has been foreclosed by the decision in *Hamling v. United States*, 418 U.S. at 87, 94 S.Ct. at 2887. In *Hamling* the Supreme Court specifically

---

6. 18 U.S.C. § 3237(a) provides:

(a) Except as otherwise expressly provided by enactment of Congress, any offense against the United States begun in one district and completed in another, or committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed.

Any offense involving the use of the mails, or transportation in interstate or foreign commerce, is a continuing offense and, except as otherwise expressly provided by enactment of Congress, may be inquired of and prosecuted in any district from, through, or into which such commerce or mail matter moves.

*See generally United States v. Bullock*, 451 F.2d 884, 889 (5th Cir. 1971) (discussing proper venue for offense involving illegal interstate transportation of stolen postal money orders).

7. Any doubts that may have existed about Congress' intent to treat federal obscenity violations as continuing offenses were put to rest with the 1958 amendments to 18 U.S.C. §§ 1461, 1462. Congress amended these statutes for the express purpose of overruling a tenth circuit decision holding that section 1461 was not a continuing offense, *see United States v. Ross*, 205 F.2d 619 (10th Cir. 1953), and thereby ensured that venue would lie "not only at the place at which the objectionable matter is mailed, but also at the place of address or delivery, or in any judicial district through which such matter is carried." H.R.Rep.No. 1614, 85th Cong., 2d Sess. 2 (1958). *See also* Conf.Rep.No.2624, 85th Cong., 2d Sess. 3–4 (1958); *United States v. McManus*, 535 F.2d 460, 463–64 (8th Cir. 1976) (discussing impact of 1958 amendments on venue in obscenity prosecutions), *cert. denied*, 429 U.S. 1052, 97 S.Ct. 766, 50 L.Ed.2d 769 (1977).

held that it was constitutionally permissible to subject defendants in obscenity prosecutions to varying community standards of the various judicial districts into which they transmit obscene material. *Id.* at 106, 94 S.Ct. at 2901. We agree with the tenth circuit that at a minimum, prosecutors may elect to bring obscenity charges against a defendant in either the district of dispatch or the district of receipt without running afoul of the due process clause. *See United States v. Blucher*, 581 F.2d at 245–46; *accord, United States v. Peraino*, 645 F.2d at 551. Indeed, prosecution in the district of receipt is eminently reasonable in view of the fact that it is the recipient community that suffers the deleterious effects of pornography distribution. *United States v. McManus*, 535 F.2d at 464.[8]

 It is equally unavailing for Bagnell to assert that his prosecution violated an enforceable Justice Department policy regarding venue. The former fifth circuit has repeatedly held that Justice Department policies such as the one allegedly involved in this case are merely matters relating to the internal operations of the Justice Department and create no enforceable right on the part of a criminal defendant. *See, e.g., United States v. McInnis*, 601 F.2d 1319, 1323 (5th Cir. 1979), *cert. denied*, 445 U.S. 962, 100 S.Ct. 1649, 64 L.Ed.2d 237 (1980); *United States v. Nelligan*, 573 F.2d 251, 255 (5th Cir. 1978); *Fry v. United States*, 569 F.2d 303, 304 (5th Cir. 1978). *See also United States v. Caceres*, 440 U.S. 741, 99 S.Ct. 1465, 59 L.Ed.2d 733 (1979). It is thus solely within the province of the Justice Department to determine whether an internal policy against forum shopping in obscenity cases should bar prosecution in a given case.

 Bagnell also contends that the district court abused its discretion in denying his motion for a change of venue to the central district of California pursuant to Rule 21(b) of the Federal Rules of Criminal Procedure. We disagree. A criminal defendant has no right to be tried in the place of his domicile, *United States v. Walker*, 559 F.2d at 372, and the defendant's concerns about the expense and inconvenience of being tried away from home are ordinarily of little relevance to a motion for a change of venue. *United States v. Sanchez*, 508 F.2d 388, 393–95 (5th Cir.), *cert. denied*, 423 U.S. 827, 96 S.Ct. 45, 46 L.Ed.2d 44 (1975). Additionally, we note that in light of the "contemporary community standards" requirement of *Miller* [*v. California*, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973)] it is logical to try a defendant [in a federal obscenity case] in the district to which he allegedly mailed obscene materials." *United States v. Slepicoff*, 524 F.2d at 1249. Indeed, it is the district of receipt that suffers the brunt of the harms associated with the distribution of pornography and is most in need of protecting itself by the application of its community standards to the material in question. *See United States v. Luros*, 243 F.Supp. 160, 176 (N.D. Iowa 1965), *rev'd on other grounds*, 389 F.2d 200 (8th Cir. 1968); H.R.Rep.No.1614, 85th Cong., 2d Sess. 6 (1958); 104 Cong.Rec. 8991–92 (May 19, 1958) (remarks of Reps. Keating and Reuss). Courts should thus exercise restraint in granting Rule 21(b) motions in obscenity prosecutions. *See United States v. McManus*, 535 F.2d at 464. At an irreducible minimum, obscenity defendants must demonstrate substantial unfair prejudice flowing from a denial of such a motion before we will overturn the district court's action. *See United States v. Walker*, 559 F.2d at 372. There was no

8. We reserve judgment, however, on the case in which an obscenity prosecution is brought in a judicial district through which allegedly pornographic material passes en route to another destination. Although prosecution in this transit district would seem to be allowed by the liberal venue provisions of section 3237, that case would be more problematic in light of both the legislative history of the 1958 amendments to the federal obscenity statutes and the principles underlying the due process clause. *See United States v. McManus*, 535 F.2d 460, 463–64 (8th Cir. 1976), *cert. denied*, 429 U.S. 1052, 97 S.Ct. 766, 50 L.Ed.2d 769 (1977); *United States v. Luros*, 243 F.Supp. 160, 176 (N.D. Iowa 1965), *rev'd on other grounds*, 389 F.2d 200 (8th Cir. 1968).

such showing here, so we will not disturb the district court's ruling.

## II. EXPERT TESTIMONY

At trial, the district court allowed Arthur R. Green, pastor of the Christ Metropolitan Community Church in Miami, to appear as an expert witness for the prosecution. Pastor Green is homosexual and his congregation is predominantly homosexual as well. He testified to the Miami homosexual community's standards regarding pornography and he opined that the average person in that community would find that the two homosexual films in question in this case appealed to the prurient interest. Bagnell contends that while expert testimony regarding the homosexual community standards about pornography was required in this case, Pastor Green was not qualified to give such expert testimony. He argues further that he was prejudiced because the improper testimony was imbued with "an aura of special reliability."

■ Initially, we reject the contention that expert testimony was necessary in this case. It is clear that hard core pornography can, and does, speak for itself, *United States v. Wild*, 422 F.2d 34, 36 (2d Cir. 1969), *cert. denied*, 402 U.S. 986, 91 S.Ct. 1644, 29 L.Ed.2d 152 (1971), and that a jury generally can determine whether allegedly pornographic material is obscene simply by viewing it. *Pinkus v. United States*, 436 U.S. 293, 302, 98 S.Ct. 1808, 1814, 56 L.Ed.2d 293 (1978); *Ginzburg v. United States*, 383 U.S. 463, 465, 86 S.Ct. 942, 944, 16 L.Ed.2d 31 (1966). *Cf. Jacobellis v. Ohio*, 378 U.S. 184, 197, 84 S.Ct. 1676, 1683, 12 L.Ed.2d 793 (1964) (Stewart, J., concurring) ("I know it when I see it . . ."). Consequently, there is no "constitutional need for 'expert' testimony on behalf of the prosecution, or for any other ancillary evidence of obscenity, once the allegedly obscene material itself is placed in evidence." *Kaplan v. California*, 413 U.S. 115, 121, 93 S.Ct. 2680, 2685, 37 L.Ed.2d 492 (1973) (citing *Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 56, 93 S.Ct. 2628, 2634, 37 L.Ed.2d 446 (1973)). The Supreme Court has recognized, however, that there may be circumstances in which expert testimony is necessary in obscenity prosecutions. The Court specifically reserved judgment "on the extreme case . . . where contested materials are directed at such a bizarre deviant group that the experience of the trier of fact would be plainly inadequate to judge whether the material appeals to the prurient interest." *Paris Adult Theatre I v. Slaton*, 413 U.S. at 56 n.6, 93 S.Ct. at 2634 n.6. This exception to the general rule regarding expert testimony in obscenity prosecutions does not apply to this case. We are unwilling to say that expert testimony is constitutionally mandated in all obscenity prosecutions involving materials depicting homosexual acts. Such materials "are not so far removed from the realm of recognizable sexuality as to render jury evaluations inappropriate" and require expert testimony. *United States v. Thomas*, 613 F.2d 787, 794 (10th Cir.), *cert. denied*, 449 U.S. 888, 101 S.Ct. 245, 66 L.Ed.2d 114 (1980).

■ While expert testimony in obscenity cases is not required, it clearly is permissible. *Hamling v. United States*, 418 U.S. at 108, 94 S.Ct. at 2902; *United States v. Slepicoff*, 524 F.2d at 1247–48; *United States v. One Reel of Film*, 481 F.2d 206, 209 n.3 (1st Cir. 1973). The district court in obscenity cases has "wide discretion in its determination to admit and exclude evidence, and this is particularly true in the case of expert testimony." *Hamling v. United States*, 418 U.S. at 108, 94 S.Ct. at 2902. We will not overturn the district court's decision to admit expert testimony unless the district court abused its discretion. *Bauman v. Centex Corp.*, 611 F.2d 1115, 1120 (5th Cir. 1980).

■ In this case, the district court might very well have excluded Pastor Green's testimony, as well as the testimony of the other expert witnesses. *See United States v. Groner*, 479 F.2d 577, 587 (5th Cir.) (en banc) (Ainsworth, J., concurring) (expert testimony in obscenity cases can be helpful, but it may confuse rather than aid the trier of fact), *vacated*, 414 U.S. 969, 94 S.Ct. 278, 38 L.Ed.2d 213 (1973) (remanded

for reconsideration in light of *Miller v. California*, 413 U.S. at 15, 93 S.Ct. at 2607), *adhered to*, 494 F.2d 499 (5th Cir.), *cert. denied*, 419 U.S. 1010, 95 S.Ct. 331, 42 L.Ed.2d 285 (1974). Nonetheless, we cannot say that the district court abused its discretion in allowing Pastor Green to testify. As adviser and counselor to a predominantly homosexual congregation in Miami, Pastor Green was intimately familiar with the social and sexual mores of at least a large part of Miami's homosexual community. Consequently, his testimony probably provided the jury with a better understanding of the obscenity issue in this case than it otherwise would have had. That he moved to Miami eight months after the films arrived there does not make his testimony inadmissible. The temporal relationship between Pastor Green's arrival in Miami and the shipment of the films is not so attenuated as to render his testimony irrelevant, so this fact goes to the weight and not the admissibility of the evidence. *See Barnes v. General Motors Corp.*, 547 F.2d 275, 278 (5th Cir. 1977). Finally, Pastor Green's testimony did not prejudice Bagnell. Bagnell's counsel adequately cross-examined Pastor Green and revealed the shortcomings of his testimony. Additionally, Pastor Green's testimony was buttressed by another expert witness who was, if anything, an even more credible witness.

## III. ENTRAPMENT

At trial, uncontroverted evidence showed that FBI Agent Livingston first contacted Bagnell in Los Angeles and that Livingston took the lead in proposing to purchase some of Bagnell's movies. The evidence also showed that Bagnell readily agreed to sell the movies and that the only discussion regarding the sale concerned the price and merchandising of the movies in question. Finally, while the evidence showed that Bagnell had previously shipped pornographic movies throughout the country, there was no evidence to show that he had ever dealt with purchasers in the southern district of Florida or that he had ever had any contacts at all with that district. At the close of the case, the district court did not deliver an entrapment instruction and the case went to the jury. During its deliberations, the jury sent a note to the judge asking if it could consider the entrapment defense that Bagnell's attorney had argued in his opening statement. The judge replied that entrapment was not in issue and that they could not consider it.

Bagnell argues that the judge's decision was erroneous. He contends that the government's case presented enough evidence of entrapment to warrant an instruction to the jury. Bagnell argues that the judge's error was not harmless and therefore warrants reversal. He asserts that evidence of his predisposition to ship the movies elsewhere does not show that he was predisposed to ship to Miami and that the jury could infer from the evidence that he had been improperly induced to send the materials to the southern district of Florida. He argues that the jury's note further demonstrated the existence of sufficient evidence to support an entrapment instruction. We reject this argument.

■■■■■ Entrapment occurs when the government induces the commission of a crime by one not predisposed to commit it. *United States v. Humphrey*, 670 F.2d 153, 154 (11th Cir. 1982); *United States v. Webster*, 649 F.2d 346, 348 (5th Cir. 1981) (en banc). Entrapment is an affirmative defense that focuses on the defendant's predisposition to commit the crime in question. *United States v. Webster*, 649 F.2d at 348. As entrapment is an affirmative defense, the defendant must come forward with evidence "that the government's conduct created a substantial risk that the offense would be committed by a person other than one ready to commit it." *United States v. Dean*, 666 F.2d 174, 180 (5th Cir.), *cert. denied*, —— U.S. —— 102 S.Ct. 2300, 73 L.Ed.2d 1303 (1982); *Pierce v. United States*, 414 F.2d 163, 168 (5th Cir.), *cert. denied*, 396 U.S. 960, 90 S.Ct. 435, 24 L.Ed.2d 425 (1969). It is clear that the government's evidence can provide this requisite evidentiary base for an entrapment instruction, *Sears v. United States*, 343 F.2d

139, 143 (5th Cir. 1965), and that failure to give an instruction when the defendant has met his burden is reversible error. *United States v. Timberlake*, 559 F.2d 1375, 1379 (5th Cir. 1977).

 An entrapment instruction would not have been proper in this case. That the government first suggested or solicited the illegal shipments does not constitute entrapment. The defendant must show "mild persuasion or coercion" on the part of the government before he is entitled to an entrapment instruction. *United States v. Humphrey*, 670 F.2d at 156 (quoting *United States v. Hill*, 626 F.2d 1301, 1304 (5th Cir. 1980)). Bagnell has failed to meet this burden. The only showing made here is one of initial government contact and Bagnell's enthusiastic willingness to sell the movies in question.

## IV. FIRST AMENDMENT

 It is undisputed that the first amendment does not protect obscene material from regulation or suppression by the government. *See Roth v. United States*, 354 U.S. 476, 483–85, 77 S.Ct. 1304, 1308–1309, 1 L.Ed.2d 1498 (1957); *Red Bluff Drive-In, Inc. v. Vance*, 648 F.2d 1020, 1026 (5th Cir. 1981), *cert. denied*, —— U.S. ——, 102 S.Ct. 1264, 71 L.Ed.2d 453 (1982). Although this basic proposition has been long established, it was not until the landmark decision in *Miller v. California*, 413 U.S. at 15, 93 S.Ct. at 2607, that any firm standards were developed to guide the determination of obscenity. In *Miller* the Supreme Court established a three-part obscenity test:

(a) whether "the average person, applying contemporary community standards" would find that the work, taken as a whole, appeals to the prurient interest . . .; (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and (c) whether the

work, taken as a whole, lacks serious literary, artistic, political or scientific value. *Id.* at 24, 93 S.Ct. at 2614 (citations omitted).[9] In applying the first two parts of the *Miller* test the trier of fact is required to utilize contemporary community standards to determine whether the allegedly pornographic material appeals to the prurient interest and whether it depicts sexual activity in a patently offensive manner. In applying the third part of the *Miller* test to determine whether the materials possess serious value, however, the trier of fact is not supposed to rely upon contemporary community standards when evaluating the evidence. *Smith v. United States*, 431 U.S. 291, 300–01, 97 S.Ct. 1756, 1763–1764, 52 L.Ed.2d 324 (1977). *Miller* delineates a constitutional test, however, and its application is not left to the unbridled discretion of the trier of fact. The appellate court is obligated to make an independent review of the material in question and an independent evaluation of the material in light of the *Miller* criteria. *Miller v. California*, 413 U.S. at 25, 93 S.Ct. at 2615; *Penthouse International, Ltd. v. McAuliffe*, 610 F.2d 1353, 1363 (5th Cir.), *cert. denied*, 447 U.S. 931, 100 S.Ct. 3031, 65 L.Ed.2d 1131 (1980). With these principles in mind, we turn to Bagnell's specific constitutional objections.

Bagnell first argues that the district court failed to instruct the jury on the proper *Miller* test. Specifically, he complains of a jury instruction that told the jury to evaluate the films according to the community standards of "the southern district of Florida, particularly Dade County." Bagnell contends that the Supreme Court has never sanctioned the use of a community standards instruction based on a geographic area smaller than a judicial district and that such an instruction is too restrictive and subject to prosecutorial abuse. He claims specific prejudice from the instruction because it excluded Broward County, which contains Fort Lauderdale, from the

---

9. *Miller* was a case involving a state obscenity prosecution. The *Miller* test, however, applies to federal obscenity prosecutions as well. *See United States v. Orito*, 413 U.S. 139, 145, 93 S.Ct. 2674, 2679, 37 L.Ed.2d 513 (1973) (prose-cution under 18 U.S.C. § 1462). *Cf. Marks v. United States*, 430 U.S. 188, 194–96, 97 S.Ct. 990, 994–995, 51 L.Ed.2d 260 (1977) (*Miller* standards not to be applied retroactively to prosecution under 18 U.S.C. § 1465).

relevant community for purposes of the obscenity analysis.

 The former fifth circuit has rejected this argument. In *United States v. Groner*, 479 F.2d at 577, the former fifth circuit held that in "obscenity cases under federal law 'the community' should logically embrace that area from which the jury is drawn and selected." *Id.* at 583. Although *Groner* was decided before the decision in *Miller*, nothing in *Miller* or any subsequent case affects the vitality of the *Groner* holding regarding the relevant community for purposes of obscenity analysis. In *Hamling v. United States*, 418 U.S. at 87, 94 S.Ct. at 2887, the Supreme Court stated that the *Miller* test envisioned no precise geographical area in determining the relevant community standards. The Court stated, however, that the purpose of the *Miller* test was "to permit a juror sitting in obscenity cases to draw on knowledge of the community ... from which he comes in deciding what conclusion 'the average person, applying contemporary community standards' would reach in a given case." *Id.* at 105, 94 S.Ct. at 2901. *Groner* comports with this mandate. It allows the jury to apply first-hand knowledge to the *Miller* test, thus obviating the need for expert testimony, while providing federal courts with flexibility to adopt efficient local procedures for jury selection. *See also United States v. Thomas*, 613 F.2d at 792. The jury in this case was drawn from Dade County alone.[10] Accordingly, the jury instruction based upon the community standards of Dade County complies with our requirement of symmetry between the jury pool and the relevant community.[11]

 Bagnell also argues that the four films forming the basis for his conviction are constitutionally protected. Essentially, he urges that the films are not obscene because none of them "deals with minors, with animals, with cruelty, masochism, sadism, excretion, defecation, or anything else that might disqualify [them] for First Amendment protection." *Miller* cannot be so circumscribed, however, as to apply only to this rather restrictive litany of possible sexual practices. The Supreme Court determined that a case-by-case evaluation of allegedly obscene material was appropriate precisely because such a list is impossible to draft. Additionally, the various degrees of tolerance throughout the country would make such a list unresponsive to local needs. *Miller v. California*, 413 U.S. at 27–28, 30–32, 93 S.Ct. at 2616–2617, 2618–2619.

---

**10.** The Jury System Improvements Act of 1978, 28 U.S.C. §§ 1861–1876, declares that it is the policy of the United States that juries be "selected at random from a fair cross section of the community in the district or division wherein the court convenes." 18 U.S.C. § 1861. Furthermore, "division" is defined to include "in judicial districts where there are no statutory divisions, such counties, parishes, or similar political subdivisions surrounding the places where court is held as the district court plan shall determine." 28 U.S.C. § 1869(e).

The southern district of Florida contains no statutory divisions, but instead is required by statute to hold court in five cities, including Miami. 28 U.S.C. § 89. The jury selection plan for the southern district of Florida provides that jurors in trials held at Miami shall be drawn from Dade and Collier Counties. In this case, the judge determined that Collier County residents should be excluded from the venire. Although this decision may indicate technical noncompliance with the 1978 Act, the defendant failed to challenge this decision, and thereby waived any statutory objections to the jury selection. *See* 28 U.S.C. § 1867(a). We note that even if the judge had fully complied with the requirements of the 1978 Act, no juror would have been drawn from Broward County. Consequently, Bagnell's contention that he was prejudiced because the judge excluded Broward County from the relevant community is completely inapposite in light of *Groner's* focus upon the jury pool for purposes of determining the relevant community.

**11.** The State of Florida has determined that the relevant community for purposes of a state obscenity prosecution is the local county. *Johnson v. State*, 351 So.2d 10, 11 (Fla.1977). Consequently, any argument by Bagnell as to lack of notice concerning the proper community for first amendment purposes is unavailing.

The net result of the holdings in *Groner* and in the instant case is as follows: the trial court in a federal obscenity prosecution does not commit error if it defines the relevant community as the area from which the jury is to be drawn according to the local jury selection plan, or the area in which the offense was committed if, as in this case, the jury is actually drawn from that area without objection by the defendant.

Applying *Miller* to the four films, we have no doubt whatever that they are obscene and may form the basis for Bagnell's conviction. Each film is devoted exclusively to the explicit depiction of various sexual practices. None of the films has a plot or any dialogue, nothing, in fact, save continual intercourse. In the first film a man and a woman engage in oral, anal, and genital copulation, while the second film depicts two women and a man engaging in oral and genital copulation as well as the women engaging in lesbian acts. Both the third and fourth films depict nothing but homosexual acts involving various types of oral copulation, anal copulation, and mutual masturbation. There can be no doubt that the average person applying contemporary community standards would find that each of the films appeals to the prurient interest and depicts sexual conduct in a patently offensive manner. Similarly, each film is devoid of any value, let alone any serious value, aside from its intended commercial purpose to cater to a prurient interest in sex. Each movie is a non-stop assault on the sensibilities of the viewer and manages only to debase sexual activity with its numbing explicitness.

We conclude that each film satisfies each part of the *Miller* test and accordingly falls outside the ambit of the first amendment. We have, in addition, determined that the district court did not commit reversible error in any of its rulings in this case.[12] There being no constitutional impediment to Bagnell's conviction or any tri-al error, we affirm his conviction under all four counts of the indictment.

AFFIRMED.

---

12. Bagnell raises three other contentions on appeal which can be dismissed in short order. He contends that the twenty-six month delay between the occurrence of the crimes charged and his indictment was prejudicial and requires reversal. For pre-indictment delay to warrant reversal, however, the defendant must show that the delay was motivated by an improper prosecutorial purpose and resulted in prejudice to the defendant. *United States v. Durnin*, 632 F.2d 1297, 1299 (5th Cir. 1980). Bagnell has failed to show an improper motive on the part of the government. Indeed, delay so as to allow a national investigation to proceed unhindered is manifestly proper. Bagnell's conclusory assertions of prejudice are also unconvincing.

Bagnell also argues that the district court improperly restricted voir dire. Curiously, he correctly concedes that this issue is completely foreclosed by *Smith v. United States*, 431 U.S. 291, 308, 97 S.Ct. 1756, 1767, 52 L.Ed.2d 324 (1977). Finally, Bagnell contends that a mistrial should have been declared when the prosecutor asked a witness whether Bagnell had offered to sell "animal films." He asserts that there was no basis for the question and that its implications prejudiced him. While we agree that the prosecutor acted improperly in this instance, the question does not require reversal. Any prejudice that might have resulted was dispelled when the witness testified that Bagnell did not sell "animal films." Additionally, the district court promptly gave an adequate curative instruction.